Filed 7/31/13; pub. order 8/23/13 (see end of opn.)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| RUSSELL C. JAY et al., | |
| Plaintiffs and Respondents, | G047325 |
| v. | (Super. Ct. No. 30-2012-00550608) |
| DOUGLAS MAHAFFEY et al., | O P I N I O N |
| Defendants and Appellants. | |

Appeal from an order of the Superior Court of Orange County, Franz E. Miller, Judge. Affirmed.

Sandler, Lasry, Laube, Byer & Valdez, James G. Sandler and Jeffrey M. Byer for Defendants and Appellants Douglas Mahaffey and Susan Ghormley.

Julander, Brown & Bollard and Richard L. Brown for Defendants and Appellants Michael Lawrence and Victoria Lawrence.

Horvitz & Levy, Jeremy B. Rosen, Steven S. Fleischman; McDermott Will & Emery and Chris C. Scheithauer for Plaintiffs and Respondents.

\* \* \*

This is an appeal from an order denying defense motions pursuant to Code of Civil Procedure section 425.16,[1] the anti-SLAPP statute,[2] in a malicious prosecution action. The underlying dispute relates to a long-term ground lease for property used as a mobilehome park in Anaheim. Defendants Michael and Victoria Lawrence (the Lawrences) owned the property. Defendants Douglas Mahaffey[3] and Susan Ghormley (collectively the attorneys) previously represented the Lawrences. JR Enterprises (JR), the property's lessee under a long-term ground lease, was a limited partnership. In a dispute primarily between the Lawrences and JR, the Lawrences brought a number of JR's limited partners into the underlying case via Roe amendments to their pleading. The limited partners were dismissed by the Lawrences several months later, and 12 of the limited partners[4] subsequently filed the instant malicious prosecution action. The Lawrences and the attorneys (collectively defendants) filed anti-SLAPP motions, which the trial court denied, concluding the limited partners had set forth a prima facie case sufficient to defeat the motions. We agree with the trial court that the limited partners

---

[1] Unless otherwise indicated, subsequent statutory references are to the Code of Civil Procedure.

[2] "SLAPP is an acronym for 'strategic lawsuit against public participation.'" (*Jarrow Formulas, Inc. v. LaMarche* (2003) 31 Cal.4th 728, 732, fn. 1.)

[3] Mahaffey & Associates is named as a defendant in this action, but was the subject of an involuntary bankruptcy proceeding and was therefore not a party to this appeal. The parties, however, stipulated that Mahaffey & Associates would be bound by this court's ruling.

[4] The limited partners who are plaintiffs in the instant malicious prosecution suit are: Russell C. Jay, Trustee of Russell C. Jay Family Trust; Nettie Long, Trustee of Long Revocable Trust dated 5/4/89; Susan J. Spiezia, Trustee of the Spiezia Trust; Leland Jay; Hayden Long; Joan E. Jay, Trustee of Marital Portion of Melvin A. Jay & Joan E. Jay Living Trust; Eugene Long, Trustee of Long Revocable Trust dated 5/4/89; Leland Jay, Trustee of Residuary Portion of Melvin A. Jay & Joan E. Jay Living Trust dated 2/25/93; Jean Keleman, Trustee of Keleman Family Trust dated 12/23/85; Melvin Keleman, Trustee of Keleman Family Trust dated 12/23/85; Leanna Garrido; and Diane Rochelle.

satisfied all three elements of a malicious prosecution case: favorable termination, lack of probable cause, and malice, as to each of the defendants. We therefore affirm.

I

FACTS

*A. Background*

At all times relevant, JR was a real estate and development company that owned and leased property in Orange and San Bernardino Counties. JR Capital Group, LLC (JR Capital) was JR's sole general partner. JR had many limited partners (more than 50) who were characterized by JR as passive investors. JR, as lessee, was the successor in interest to a long-term ground lease in Anaheim that is not due to expire for another 50 years. The property, since the 1960's, has been operated as a mobilehome park.

At some point, the Lawrences became the property's owners as successors in interest to the original owner and lessor. Michael[5] was apparently unhappy with the lease's terms, and expressed his desire to sell and redevelop the property, which was impossible because of the long-term lease. In 2007, Michael began to look for ways to end the lease. He offered JR's president, John Spiezia, a personal seven-figure payment if Spiezia would work with him to end the lease. He contacted one of the limited partners, Diane Rochelle, and through her attorney attempted to obtain contact information for the limited partners to organize them against Spiezia and JR. Michael also tried to persuade the City of Anaheim to "at least threaten condemnation to get the lessee to fall in line."

---

[5] When necessary, we use the Lawrences' first names to avoid confusion. No disrespect is intended.

*B.  First Breach of Lease Action*

In August 2008, the Lawrences filed their first breach of lease action against JR, alleging claims for quiet title and declaratory relief and seeking to terminate the lease.  They were represented by Mahaffey and Mahaffey & Associates.  JR filed a cross-complaint, alleging claims for breach of the lease[6] and declaratory relief.  During closing argument, Mahaffey stated, with respect to JR, that in a general partnership, "There are no shareholders.  There are no directors.  The limited partners make no decisions."

The trial was bifurcated, with the court deciding some issues and the jury others.  The Lawrences prevailed on several claims, but JR prevailed on the others.  In March 2011, an amended net judgment was entered in JR's favor for $129,766.50.  The Lawrences appealed, but the trial court's decision was subsequently affirmed by this court.  (*Lawrence et al. v. JR Enterprises, L.P.* (May 15, 2013, G044999) [nonpub. opn.].)

While final judgment in this action was still pending, Mahaffey sent an e-mail to JR's counsel on December 8, 2010.  Purportedly seeking information regarding the turnover of the one-acre parcel that was the subject of JR's cross-complaint, the e-mail pointed to "many other battles ahead between these clients."  Mahaffey stated: "As to the bigger picture, you know of course that final rulings on the issue of lease termination and forfeiture, the final wording on the judgment, who is the prevailing party, attorneys fees . . . new trial motions, and finally an appeal on over 20+ separate issues will be filed."

He went on to say:  "Also, and I am sure this comes as no surprise, a new action for lease termination, raising several breaches and illegal conduct issues will be filed, probably next week."  According to Mahaffey, he learned for the first time during

---

[6] JR's breach of lease claim related to a one-acre parcel JR claimed should have been turned over to it in 2009.

4

trial that JR was illegally selling mobilehomes on the property, because it lacked the proper licensing. After going on to list other possible issues that might be raised in a second lawsuit, Mahaffey stated: "I know there is a number that my clients would sell their fee interest and your clients and their partners would not only avoid substantial risk, but would still make millions of dollars from the investment. [¶] If it is not time to talk about a serious number that reflects the reality of the risk your clients are taking, I understand. There will be many opportunities in the next five years of Superior Court and Court of Appeal litigation to further develop the clients view points. We are available to discuss that number . . . your clients are nowhere near close to what it would take. At this point I assume they understand that 500K a year of an attorneys fees budget on this lease will become the norm for many years to come, and that all of [the rulings in the first action] will be fully reviewed in approximately 18 months, about the time the next jury completes its verdict form. This is a very interesting case to me . . . I am excited for round two. If they wish to deprive me of that, let me know if your clients want to exchange numbers in a range that my clients will consider. If not, congratulations are in order on the jury verdict — I guess."

C. *The Interpleader Action and Cross-Complaints*

On January 17, 2011, the Lawrences sent JR a demand for payment of some $30,000 relating to utilities for one part of the property. The letter requested payment be made to Mahaffey's trust account. Shortly thereafter, JR was served with a notice of lien against Mahaffey by Plan 53, LLC. JR's counsel sent a response seeking clarification as to whether the amounts claimed in the January 17 letter were subject to the lien, but no response was forthcoming.

On March 2, JR filed a complaint for interpleader, declaratory relief and unjust enrichment regarding payment of money under the lease. On April 26, the Lawrences, represented by Mahaffey, filed the first of two cross-complaints. The first

5

cross-complaint alleged breach of contract for the failure to pay the money demanded in the January 17 letter, breach of contract and request for lease termination/forfeiture based on the allegedly illegal mobilehome sales, and declaratory relief.[7] JR filed an anti-SLAPP motion directed toward the first breach of contract cause of action, which the trial court denied. We affirmed in *JR Enterprises, L.P. v. Lawrence et al.* (Jan. 9, 2013, G046180) [nonpub. opn.]).

On April 28, Mahaffey sent another e-mail to JR's counsel. "As fun as the next five to ten years are going to be between our clients in multiple Courts" he began, before urging JR to settle and purchase the property. He then stated that he would like to depose some of the limited partners, before closing with: "Regards, and wow this next round is going to be a fee generator for a lot of lawyers at your firm . . . (and of course me)!"

On June 20, the Lawrences filed a pleading captioned "Cross-Complaint to Cross-Complaint" in the interpleader action (the second cross-complaint). It alleged essentially the same three causes of action as the first cross-complaint: breach of contract, breach of covenant, and request for lease termination/forfeiture, and declaratory relief. The second cross-complaint, which eventually became the subject of the instant malicious prosecution action, named both JR and Rochelle, one of the limited partners.

---

[7] The limited partners ask this court to take judicial notice of: 1) the first cross-complaint, 2) the notice of dismissal of that cross-complaint, 3) the Lawrences' respondent's brief in the appeal of JR's anti-SLAPP motion, 4) this court's opinion in that case (*JR Enterprises, L.P. v. Lawrence et al.* (Jan. 9, 2013, G046180) [nonpub. opn.]) and 5) this court's opinion in an unrelated case in which Mahaffey was a defendant (*Grunder v. Mahaffey* (Nov. 7, 2012, G045013) [nonpub. opn.]).

As court records, these documents are subject to judicial notice under Evidence Code sections 452, subdivision (d), and 459. Judicial notice may be granted if the documents for which notice is sought are at least minimally relevant to the instant appeal. (*Mangini v. R. J. Reynolds Tobacco Co.* (1994) 7 Cal.4th 1057, 1063.) The first four documents listed above meet that standard, but we see no particular relevance as to the final document, this court's opinion in *Grunder v. Mahaffey*. The request is therefore granted as to the first four documents.

The Lawrences alleged Rochelle had ratified JR's conduct with respect to the mobilehome sales, and alleged generally that the limited partners were co-venturers who had ratified JR's conduct. The Lawrences had not, at that point, taken the deposition of Rochelle or any of the limited partners.

On July 26, the Lawrences dismissed the first cross-complaint with prejudice. On September 12, the Lawrences filed Roe amendments to the second cross-complaint in the interpleader action, thus adding 45 of JR's limited partners as cross-defendants. Some of the amendments were signed by Mahaffey and some were signed by Ghormley, his associate.

Prior to filing the amendments, no depositions of limited partners had been taken, although five depositions were noticed subsequently on October 3. Both Mahaffey and Ghormley's names appeared in the captions of the deposition notices. According to Mahaffey, he believed, based on his experience, that the limited partners received reports relating to financial performance, "attend meetings and are well-informed about the dealings of their partnership."[8] He therefore believed the limited partners knew, among other things, about the purportedly illegal mobilehome sales.

During a phone call with Ghormley on November 4, counsel for the limited partners, Chris C. Scheithauer, asked why they had been sued when the limited partners were not parties to the lease. She replied, "Doug Mahaffey has plans for the Limited Partners."

Leland Jay, one of the limited partners who held a three percent interest in JR, had his deposition taken on November 10. According to Mahaffey: "[Jay] testified that as a JR limited partner he was unaware of how much income JR generated from the Property, or what portion of his partnership distributions were attributable to the Property

---

[8] Mahaffey's declaration with these statements was excluded (appropriately, as we discuss *post* in Part II.C) by the trial court. We have included limited portions of it here, as part of the record below, for the purposes of painting a more complete picture.

7

(as opposed to JR's other holdings). . . . Mr. Jay further testified he did not know if JR had a license which allowed it to sell mobile homes, did not know whether JR sold mobile homes at the Property, and, if so, did not know if JR generated any income from such sales. . . . He testified that while he annually receives a schedule K-1 and an occasional memo from JR . . . he had never seen JR's books or records." Mahaffey later claimed he decided almost immediately to dismiss the limited partners for a number of business reasons.

On November 15, the limited partners (except Rochelle) filed a demurrer to the third cause of action in the second cross-complaint.[9] On the same date, the limited partners filed a challenge under section 170.6 (the 170.6 motion) to trial Judge B. Tam Nomoto Schumann. They also filed a cross-complaint against JR for indemnity. Mahaffey claims he told counsel for the limited partners about the dismissals before they filed these papers.

On November 16, Mahaffey contacted Scheithauer. According to Scheithauer, Mahaffey complained about the 170.6 motion and stated that the Lawrences and the limited partners should be "aligned" against JR and Spiezia. Mahaffey stated that if the limited partners would withdraw their 170.6 motion, the Lawrences would dismiss the limited partners except for Rochelle. He also stated that he would "represent the Limited Partners in a 'derivative' action against JR Enterprises and John Spiezia on contingency and would provide a 'finders fee' to my law firm." Mahaffey was not concerned about a conflict of interest because the limited partners "were 'not really at

_____

[9] Pursuant to stipulation, the limited partners were not required to file a response to the second cross-complaint until December 8, 2011. Defendants seem to imply something untoward about their decision to file earlier.

8

fault.'" The limited partners had been sued "'to get their attention' and be sure they were aware of how JR Enterprises had ignored the Lawrences' attempts to settle . . . ."[10]

Scheithauer and Mahaffey also discussed Rochelle. Mahaffey told Scheithauer she was a "special case,"[11] and the Lawrences would only dismiss her if she produced certain financial information, including confidential tax reports, and agreed to testify on the Lawrences' behalf. Scheithauer declined all of Mahaffey's offers.

On November 17, Scheithauer was contacted by Ghormley. She called to ask whether there would be a stipulation to dismiss the limited partners in exchange for a withdrawal of the 170.6 motion. Scheithauer declined again, but did ask about whether Rochelle would be included in such a stipulation. Ghormley said she would need to check with Mahaffey because Rochelle was a "special case." Nonetheless, on the same day, November 17, the Lawrences proceeded to file dismissals without prejudice as to all the limited partners except Rochelle.

On November 18, Mahaffey wrote Scheithauer a letter expressing his desire to "work with [the limited partners] on a business solution that includes, but is not limited to, a buyout of some or all of their interest" in exchange for financial documents. He also repeated the offer of a derivative action. Among other things, the letter stated: "It is transparent, however, from my deposition of Leland Jay, that the limited partners have absolutely no involvement with the general partner as to decisions regarding the management of the subject lease."

---

[10] The Lawrences argue, apparently for the first time on appeal, that these statements were hearsay. Even if this argument is properly raised (and it is not, for several reasons), the statements are admissible against Mahaffey as admissions by a party opponent (Evid. Code, § 1220), and against the Lawrences because Mahaffey was their agent (Evid. Code, § 1222).

[11] Rochelle was the surviving spouse of JR's founder, Ben Rochelle, and had a larger financial interest than the other limited partners.

9

On November 21, Mahaffey called Scheithauer and told him that if the 170.6 motion was not withdrawn and was granted, the Lawrences would "re-sue" the limited partners they had just dismissed. On November 22, Judge Thomas J. Borris granted the 170.6 motion and transferred the interpleader action to Judge Andrew P. Banks.

On November 23 (the day before Thanksgiving), the Lawrences applied for an ex parte order striking the 170.6 challenge. Scheithauer could not attend as he was travelling for the holiday (a situation about which Mahaffey was aware), and an associate appeared instead.

At the hearing before Judge Gregory H. Lewis, Mahaffey told the court that the Lawrences had taken the deposition of one of the limited partners, "and became convinced that they are so limited in their involvement that those causes of action likely could never be proven." He argued that significant rulings had taken place before Judge Schumann, the limited partners' 170.6 motion amounted to "forum shopping," and they had acted in bad faith by filing the demurrer and the motion. He also said: "And, frankly, [it is] a bit dangerous to challenge the plaintiff in this manner, because if they are going to proceed in this bad faith manner, I told their clients they may well end up being brought back in as defendants, and that would be something that their attorney caused." During the hearing, Mahaffey also told the court the limited partners had been dismissed "with prejudice," when in fact, the dismissals had been filed without prejudice.

At the conclusion of the hearing, Judge Lewis, apparently unaware that Judge Borris had already granted the 170.6 motion, granted the ex parte application to strike the motion.

On November 28, Rochelle, who had not yet appeared, filed a demurrer, cross-complaint and her own 170.6 motion. On November 29, the Lawrences filed a dismissal as to Rochelle, and on November 30, they filed an ex parte application to strike Rochelle's 170.6 motion. The Lawrences argued the dismissal rendered the 170.6 motion

10

moot. On November 29, Judge Borris issued an order stating that the court would take no further action as the matter had already been reassigned to Judge Banks. The Lawrences attempted to proceed on their ex parte anyway, but Judge Schumann ordered the application off calendar due to Judge Borris's order confirming that the case had been transferred to Judge Banks.

At the hearing on December 5 before Judge Steven L. Perk, the Lawrences sought relief under section 473. Mahaffey told the court he had "inadvertently" failed to dismiss Rochelle at the same time as the other limited partners. Scheithauer challenged the assumption that the failure to dismiss Rochelle was a mistake at all, pointing to his declaration which recounted his conversations with Ghormley and Mahaffey, including Ghormley's "special case" comment and Mahaffey's attempt to bargain for Rochelle's dismissal. The court held that the Lawrences had not met their burden to show that relief under section 473 was appropriate.

## D. The Malicious Prosecution Action

On March 5, 2012, twelve of the limited partners filed the instant malicious prosecution action against the Lawrences, Mahaffey, Mahaffey & Associates, and Ghormley. The complaint pled two causes of action, malicious prosecution for bringing the case and malicious prosecution for continuing it. The Lawrences answered with a general denial. The attorneys filed an answer pleading several affirmative defenses.

In May, defendants filed anti-SLAPP motions. The attorneys' argument focused on probable cause and malice, arguing that the second cross-complaint did not allege the limited partners were liable for JR's contractual obligations, but were liable for participating in illegal conduct (presumably the mobilehome sales) and benefitting from those activities. Mahaffey's declaration in support of the motion was brief and served only to authenticate exhibits. There is no declaration from Ghormley in the record. The other evidence submitted in support of the attorneys' motion consisted of documents

11

from the interpleader action. The Lawrences' motion also focused on probable cause and malice. They did not submit separate exhibits, relying on the attorneys' documents, nor did they submit a declaration by either Michael or Victoria.

The limited partners' opposition was accompanied by fairly voluminous evidence, including more than a dozen declarations. The declarations included all 12 of the limited partners, each of whom stated essentially that they were passive investors who had no involvement in JR's management or operations. The declarations also included those from other individuals, including attorneys (both the limited partners' and JR's), Spiezia, and others who had had contact with both Michael Lawrence and the attorneys, testifying as to their interactions. The oppositions argued the limited partners had met their burden of demonstrating a prima facie case of malicious prosecution existed, and the motions should therefore be denied.

In their reply briefs, defendants raised the issue of favorable termination for the first time. Mahaffey also submitted a substantive declaration which stated that his reason for dismissing the limited partners was a business decision. Ghormley also filed a declaration, essentially stating she was following Mahaffey's directions. The Lawrences filed a declaration from Michael, in which he claimed he was relying on the advice of counsel when he decided to sue the limited partners. Mahaffey filed numerous evidentiary objections and the Lawrences also filed two others.

The limited partners then filed objections to the reply declarations, arguing that defendants could not submit new evidence with their reply. They also filed a declaration from their attorney to address the issues raised by the attorneys for the first time in the reply.

The trial court issued a tentative denying the motions. Among other things, the court stated the evidence showed it was "not at all likely" that defendants "can show any control exercised by limited partners — in fact evidence shows the defendants knew the limited partners were not in control." Because no tort claims were alleged, the

12

tortious conduct exception in the Corporations Code did not apply, and evidence of malice was "ample." The tentative also granted various requests for judicial notice, overruled the Lawrences' and the attorneys' evidentiary objections, and sustained the limited partners' objection to the late reply declarations. The court took the motions under submission after hearing argument. The court then issued a minute order confirming the tentative. Defendants now appeal.

## II

## DISCUSSION

### A. Statutory Framework

The anti-SLAPP statute states: "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (§ 425.16, subd. (b)(1).) The purpose of the anti-SLAPP statute is to dismiss meritless lawsuits designed to chill the defendant's free speech rights at the earliest stage of the case. (See *Wilcox v. Superior Court* (1994) 27 Cal.App.4th 809, 815, fn. 2.) The statute is to be "construed broadly." (§ 425.16, subd. (a).)

Section 425.16, subdivision (e), specifies the type of acts included within the statute's ambit. An "'act in furtherance of a person's right of petition or free speech . . . in connection with a public issue' includes: (1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law, (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law, (3) any written or oral statement or writing made in a place open to the public or a public forum in connection

13

with an issue of public interest, or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e).)

Courts engage in a two-step process to resolve anti-SLAPP motions. "'First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity. The moving defendant's burden is to demonstrate that the act or acts of which the plaintiff complains were taken "in furtherance of the [defendant]'s right of petition or free speech under the United States or California Constitution in connection with a public issue," as defined in the statute. (§ 425.16, subd. (b)(1).)'" (*Jarrow Formulas*, *Inc. v. LaMarche*, *supra*, 31 Cal.4th at p. 733.)

"'If the court finds such a showing has been made, it then determines whether the plaintiff has demonstrated a probability of prevailing on the claim.' [Citation.]" (*Jarrow Formulas*, *Inc. v. LaMarche*, *supra*, 31 Cal.4th at p. 733.) To establish the requisite probability of prevailing, the plaintiff must state and substantiate a legally sufficient claim (*Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1122-1123), thereby demonstrating his case has at least minimal merit. (*Cole v. Patricia A. Meyer & Associates, APC* (2012) 206 Cal.App.4th 1095, 1105 (*Cole*).) "Put another way, the plaintiff 'must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited.' [Citations.]" (*Wilson v. Parker, Covert & Chidester* (2002) 28 Cal.4th 811, 821.) The limited partners must therefore "produce evidence that would be admissible at trial. [Citation.]" (*HMS Capital, Inc. v. Lawyers Title Co.* (2004) 118 Cal.App.4th 204, 212 (*HMS Capital*).)

14

*B. Standard of Review*

On appeal, we "review an order granting an anti-SLAPP motion de novo, applying the same two-step procedure as the trial court.  [Citation.]"  (*Cole*, *supra*, 206 Cal.App.4th at p. 1105.)  In conducting our review, "[w]e consider 'the pleadings, and supporting and opposing affidavits . . . upon which the liability or defense is based.'  [Citation.]  However, we neither 'weigh credibility [nor] compare the weight of the evidence.  Rather, [we] accept as true the evidence favorable to the plaintiff [citation] and evaluate the defendant's evidence only to determine if it has defeated that submitted by the plaintiff as a matter of law.'  [Citation.]"  (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 269, fn. 3 (*Soukup*).)

With respect to evidentiary challenges submitted in connection with an anti-SLAPP motion, we review the trial court's rulings for abuse of discretion.  (*Morrow v. Los Angeles Unified School Dist.* (2007) 149 Cal.App.4th 1424, 1444.)  "A trial court's exercise of discretion will be disturbed only for clear abuse.  [Citation.]"  (*Batarse v. Service Employees Internat. Union, Local 1000* (2012) 209 Cal.App.4th 820, 827.)

*C. Evidentiary Objections to the Reply Declarations*

Before we address the substance of the anti-SLAPP motions, we address defendants' evidentiary argument.  Defendants contend the trial court abused its discretion by excluding the declarations of Michael, Mahaffey and Ghormley that were filed with their reply briefs in the trial court.  As noted above, neither the Lawrences nor the attorneys submitted substantive declarations with their moving papers.  Their argument justifying this decision is that because the nonmoving party had the burden of satisfying the second prong of the anti-SLAPP statute, minimal merit, the moving party was not required to submit *any* evidence on this point in their moving papers.

15

This argument is misplaced. Neither the Lawrences nor the attorneys cite any anti-SLAPP cases in which, for the *first time in reply*, the moving parties introduced entirely new evidence. They cite cases in which courts have considered evidence in reply, but such evidence was supplemental to evidence submitted in the moving papers, not brand new. In *Wong v. Jing* (2010) 189 Cal.App.4th 1354 (cited by defendants for the first time in their reply briefs), the court, in dicta, suggested that a reply declaration was sufficient to establish a defendant's lack of liability. There was, however, no explicit evidentiary ruling in that case.

Defendants also argue the statutory language of section 425.16, subdivision (b)(2), requires the court to consider all evidence submitted. But the statute neither suggests nor states that normal rules of evidence and procedure do not apply to anti-SLAPP motions, and again, defendants offer no authority suggesting otherwise. They contend their decision was justified because they could not possibly guess what the limited partners might offer to meet their burden. Defendants are wrong — they knew from the complaint exactly what the basis of the limited partners' argument was: "The purpose of the Lawrences and their counsel in bringing suit against the Limited Partners was not to pursue some legal right that they actually believed they possessed. Rather, the purpose was a malicious scheme, concocted by the Lawrences, Douglas Mahaffey and Susan Ghormley, to so harass and vex the Limited Partners that the Limited Partners would — in turn — harass and vex JR Enterprises and otherwise use their power as the Limited Partners to force JR Enterprises into settling . . . and as leverage to help the Lawrences obtain 'a business resolution of their dispute with JR Enterprises,' including, but not limited to, a buyout of the partnership interests of the Limited Partners." The complaint then goes on to detail the sequence of events with regard to naming the limited partners in the interpleader action, including the 170.6 motions. It discusses conversations and statements made by the attorneys. It is simply specious for defendants

to argue they had absolutely no idea what evidence the limited partners would be presenting.

The general rule of motion practice, which applies here, is that new evidence is not permitted with reply papers. This principle is most prominent in the context of summary judgment motions, which is not surprising, given that it is a common evidentiary motion. "[T]he inclusion of additional evidentiary matter with the reply should only be allowed in the exceptional case" and if permitted, the other party should be given the opportunity to respond. (*Plenger v. Alza Corp.* (1992) 11 Cal.App.4th 349, 362, fn. 8; *see Nazir v. United Airlines, Inc.* (2009) 178 Cal.App.4th 243, 252; *San Diego Watercrafts, Inc. v. Wells Fargo Bank* (2002) 102 Cal.App.4th 308, 316.) The same rule has been noted in other contexts as well. (*Alliant Ins. Services, Inc. v. Gaddy* (2008) 159 Cal.App.4th 1292, 1308 [in preliminary injunction proceeding, "the trial court had discretion whether to accept new evidence with the reply papers"].)

This rule is based on the same solid logic applied in the appellate courts, specifically, that "[p]oints raised for the first time in a reply brief will ordinarily not be considered, because such consideration would deprive the respondent of an opportunity to counter the argument." (*American Drug Stores v. Stroh* (1992) 10 Cal.App.4th 1446, 1453; see also *Brown v. County of Tehama* (2013) 213 Cal.App.4th 704, 720, fn.10.)

To the extent defendants argue they had the right to file any reply declarations at all, they are not wrong. Such declarations, however, should not have addressed the substantive issues in the first instance, but only filled gaps in the evidence created by the limited partners' opposition. Defendants' decision to wait until the reply briefs to bring forth *any* evidence at all, when the limited partners would have no opportunity to respond, was simply unfair. Thus, while the trial court had discretion to admit the reply declarations, it was not an abuse of discretion to decline to do so.

In any event, even if we were to consider this evidence, it is ultimately of little import, due to the manner in which anti-SLAPP motions are reviewed. As we

17

discussed above, "we neither 'weigh credibility [nor] compare the weight of the evidence. Rather, [we] accept as true the evidence favorable to the plaintiff [citation] and evaluate the defendant's evidence only to determine if it has defeated that submitted by the plaintiff as a matter of law.' [Citation.]" (*Soukup*, *supra*, 39 Cal.4th at p. 269, fn. 3.)

## D. Protected Activity

As noted *ante* in section II.A, the first step in the anti-SLAPP analysis is to determine whether the challenged cause of action arises from protected activity. (*Jarrow Formulas*, *Inc. v. LaMarche*, *supra*, 31 Cal.4th at p. 733.) This first step is readily satisfied here, as it is in nearly all claims for malicious prosecution. (See *id.* at pp. 734-735.) "It is well established that filing a lawsuit is an exercise of a party's constitutional right of petition. [Citations.] ""[T]he constitutional right to petition . . . includes the basic act of filing litigation or otherwise seeking administrative action."" [Citations.]" (*Chavez v. Mendoza* (2001) 94 Cal.App.4th 1083, 1087.) "Under these accepted principles, a cause of action arising from a defendant's alleged improper filing of a lawsuit may appropriately be the subject of a section 425.16 motion to strike. [Citation.] The essence of the [plaintiffs'] malicious prosecution claim is that the plaintiff in the underlying action . . . filed litigation that was improper because it was allegedly filed with a malicious motive and without probable cause. This claim 'aris[es] from' the defendant's constitutionally protected petitioning activity, and therefore is subject to the anti-SLAPP statute. [Citation.]" (*Id.* at p. 1087-1088; *see also Cole*, *supra*, 206 Cal.App.4th at p. 1105.) We therefore turn to the question of whether the limited partners established the requisite probability of prevailing on his claim.

## E. Malicious Prosecution — Prima Facie Requirements

"To prevail on a malicious prosecution claim, the plaintiff must show that the prior action (1) was commenced by or at the direction of the defendant and was

pursued to a legal termination favorable to the plaintiff; (2) was brought without probable cause; and (3) was initiated with malice. [Citation.]" (*Soukup*, *supra*, 39 Cal.4th at p. 292.) Continuing an already filed lawsuit without probable cause may also be the basis for a malicious prosecution claim. (*Zamos v. Stroud* (2004) 32 Cal.4th 958, 969 (*Zamos*); see also *Daniels v. Robbins* (2010) 182 Cal.App.4th 204, 226.)

We keep in mind that malicious prosecution is a "disfavored action." (*Leonardini v. Shell Oil Co*. (1989) 216 Cal.App.3d 547, 566.) "[T]he elements of [malicious prosecution] have historically been carefully circumscribed so that litigants with potentially valid claims will not be deterred from bringing their claims to court by the prospect of a subsequent malicious prosecution claim." (*Sheldon Appel Co. v. Albert & Oliker* (1989) 47 Cal.3d 863, 872 (*Sheldon Appel*).)


*F. Favorable Termination*

"To determine whether a party has received a favorable termination, we consider '"the judgment as a whole in the prior action . . . ." [Citation.]' [Citation.] Victory following a trial on the merits is not required. Rather, '"the termination must reflect the merits of the action and the plaintiff's innocence of the misconduct alleged in the lawsuit." [Citation.]' [Citation.]" (*Siebel v. Mittlesteadt* (2007) 41 Cal.4th 735, 741.) The defendants argue that the dismissal of the limited partners was not a termination on its merits, but reflected the business decision rationale set forth in Mahaffey's properly excluded declaration, or other "practical grounds."

"A voluntary dismissal is presumed to be a favorable termination on the merits . . . ." (*Sycamore Ridge Apartments LLC v. Naumann* (2007) 157 Cal.App.4th 1385, 1400.) Here, defendants offer no evidence to rebut this presumption other than Mahaffey's excluded declaration, which is, of course, not evidence at all.

Even if we were to consider Mahaffey's declaration on this point, his self-serving testimony is belied by other statements, such as telling the court that "the limited

19

partners have absolutely no involvement with the general partner as to decisions regarding the management of the subject lease." Such a contemporaneous statement strongly suggests the limited partners were dismissed because they had no liability. At best, the evidence is conflicting and therefore cannot defeat the limited partners' prima facie case. (*Soukup*, *supra*, 39 Cal.4th at p. 269, fn. 3.) From either angle, the court properly found the limited partners had set forth a prima facie case of favorable termination.

*G. Probable Cause*

"Probable cause exists when a lawsuit is based on facts reasonably believed to be true, and all asserted theories are legally tenable under the known facts." (*Cole, supra,* 206 Cal.App.4th at p. 1106.) The court must "determine whether, on the basis of the facts known to the defendant, the institution of the prior action was legally tenable." (*Sheldon Appel*, *supra*, 47 Cal.3d at p. 878.) We evaluate this question of law under an objective standard, asking whether any reasonable attorney would have thought the claim tenable. (*Zamos*, *supra*, 32 Cal.4th at p. 971.)

More specifically, "'"probable cause to bring an action does not depend on it being meritorious, as such, but upon it being *arguably tenable,* i.e., not so completely lacking in merit that no reasonable attorney would have thought the claim tenable. [Citation.]"' [Citation.] Probable cause exists if the claim is legally sufficient and can be substantiated by competent evidence. [Citation.]" (*Antounian v. Louis Vuitton Malletier* (2010) 189 Cal.App.4th 438, 448-449.) "In analyzing the issue of probable cause in a malicious prosecution context, the trial court must consider both the factual circumstances established by the evidence and the legal theory upon which relief is sought. A litigant will lack probable cause for his action either if he relies upon facts which he has no reasonable cause to believe to be true, or if he seeks recovery upon a

legal theory which is untenable under the facts known to him." (*Sangster v. Paetkau* (1998) 68 Cal.App.4th 151, 164-165.)

The limited partners argue that they are absolutely immune from any lawsuit seeking to impose liability on JR under the lease. Under the Uniform Limited Partnership Act (ULPA) (Corp. Code, § 15900 et seq.), limited partners are immune from limited partnership liabilities unless they participate in the operations of the partnership. If there is any liability, it is only to those people or entities with whom they transacted business and who believed they were acting as general partners. (Corp. Code, § 15903.03, subd. (a).) The limited partners contend there is no dispute that the lease is the subject of the underlying action, they were not parties to the lease, and there was no evidence that any of the limited partners ever transacted business with the Lawrences. Indeed, the evidence was to the contrary.

They therefore argue that given these facts, no reasonable attorney could ever have thought it was reasonable to bring the claims in the second cross-complaint for breach of contract, breach of covenant, and declaratory relief. The breach of contract cause of action specifically alleged a breach of the lease. The second cause of action for breach of covenant alleged JR had breached a covenant in the lease by conducting illegal mobilehome sales, and the limited partners "ratified this illegal conduct." The basis for the second cause of action was that such alleged illegal activity violated a specific provision in the lease. The declaratory relief claim merely alleged there was a controversy and sought a declaration interpreting the responsibilities of the parties. Based on the narrowly circumscribed liability of limited partners under law, and the nature of the claims alleged in the second cross-complaint, we agree with the limited partners that they have stated a prima facie case demonstrating a lack of probable cause. We therefore examine defendants' evidence to see if they can defeat the claim as a matter of law. (*Soukup*, *supra*, 39 Cal.4th at p. 269, fn. 3.)

21

Defendants contend that the limited partners were not exempt from *tort* liability, relying on an exemption in Corporations Code section 15903.03, subdivision (a). This is an interesting argument, considering, as described above, the cross-complaint alleged claims for breach of contract, breach of a covenant in that same contract, and declaratory relief. The Lawrences claim the allegations relating to the second cause of action, relating to the mobilehome sales, were sufficient to constitute a tort theory of liability. The attorneys contend "the evidence presented to the court established at least an inference that the Limited Partners were liable in tort to the Lawrences." They point to Mahaffey's assertions as to his understanding of limited partners' participation in partnership dealings, again pointing to these statements in his excluded declaration.

First, once again, the defendants' only actual evidence on this point is based on properly excluded evidence. Second, we reject their contention that unpled hidden theories of liability are sufficient to create probable cause. Their citations to cases regarding the permissibility of liberal amendments are simply misplaced here, because at no time did the defendants amend or seek to amend their second cross-complaint to include tort claims. Third, defendants failed to offer any evidence that the alleged statutory violations were subject to a private right of action, and thus, cognizable claims by the Lawrences at all. (See Health & Saf. Code, § 18020 [the statute allegedly violated] and Health & Saf. Code, §§ 18002.8, 18020, subd. (a), 18021.5, subds. (b), (e) [discussing enforcement by the Department of Housing and Community Development].)

The limited partners also cite *Kreeger v. Wanland* (2006) 141 Cal.App.4th 826 (*Kreeger*), arguing that even if the Lawrences had valid unpled tort claims, they were required to demonstrate probable cause for each and every cause of action in the underlying case. "Where a prior action asserted several grounds for liability, an action for malicious prosecution will lie if any one of those grounds was asserted with malice and without probable cause. [Citation.]" (*Id.* at p. 832.) The limited partners argue it is indisputable that the Lawrences sued them for breach of lease, a cause of action that no

22

reasonable attorney would bring given the state of the law regarding the liability of limited partners for contractual obligations. They are correct.

The Lawrences, for the first time in their reply brief, argue they relied on Mahaffey's advice. This is often a valid defense. "Reliance upon the advice of counsel, in good faith and after full disclosure of the facts, customarily establishes probable cause. [Citations.]" (*Sosinsky v. Grant* (1992) 6 Cal.App.4th 1548, 1556.) As discussed above, however, we do not entertain new points raised for the first time in a reply brief absent good cause. (*Reichardt v. Hoffman* (1997) 52 Cal.App.4th 754, 764.) There is absolutely no sound reason this issue could not have been raised in the Lawrences' opening brief. We therefore grant the limited partners' motion to strike pages 13-17 of the Lawrences' reply brief.

Further, even if we were to consider this argument, it is premised on statements made by Mahaffey and Michael in their excluded reply declarations, and therefore unsupported by admissible evidence. In sum, we conclude the limited partners successfully set forth a prima facie showing of the lack of probable cause, and this evidence was not defeated, as a matter of law, by defendants' evidence.[12] (*Soukup*, *supra*, 39 Cal.4th at p. 269, fn. 3.)

*H. Malice*

"The 'malice' element . . . relates to the *subjective intent or purpose* with which the defendant acted in initiating the prior action. [Citation.] The motive of the defendant must have been something other than that of bringing a perceived guilty person to justice or the satisfaction in a civil action of some personal or financial purpose.

---

[12] Because we conclude there was no probable cause to bring the case against the limited partners at any time, we need not separately consider the issue of whether defendants wrongfully continued prosecuting the case after becoming aware of a lack of probable cause.

23

[Citation.]  The plaintiff must plead and prove actual ill will *or* some *improper* ulterior motive.  [Citation.]" (*Downey Venture v. LMI Ins. Co.* (1998) 66 Cal.App.4th 478, 494 (*Downey Venture*).)

The lack of probable cause is one factor in determining the presence of malice, but alone it is insufficient.  (*HMS Capital*, *supra*, 118 Cal.App.4th at p. 218.) "Merely because the prior action lacked legal tenability, as measured objectively (i.e., by the standard of whether any reasonable attorney would have thought the claim tenable [citation]), *without more*, would not logically or reasonably permit the inference that such lack of probable cause was accompanied by the actor's subjective malicious state of mind.  In other words, the presence of malice must be established by other, additional evidence." (*Downey Venture*, *supra*, 66 Cal.App.4th at p. 498, fn. omitted.)

Such other evidence "is not limited to actual hostility or ill will toward the plaintiff.  Rather, malice is present when proceedings are instituted primarily for an improper purpose." (*Sierra Club Foundation v. Graham* (1999) 72 Cal.App.4th 1135, 1157.)  "Suits with the hallmark of an improper purpose" include "those in which:  "". . . (1) the person initiating them does not believe that his claim may be held valid; (2) the proceedings are begun primarily because of hostility or ill will; (3) the proceedings are initiated solely for the purpose of depriving the person against whom they are initiated of a beneficial use of his property; (4) the proceedings are initiated for the purpose of forcing a settlement which has no relation to the merits of the claim."'  [Citation.]" (*Ibid.*)

Because direct evidence of malice is rarely available, "malice is usually proven by circumstantial evidence and inferences drawn from the evidence." (*HMS Capital*, *supra*, 118 Cal.App.4th at p. 218.)

*1.  Mahaffey*

24

The trial court found there was "ample" evidence of malice, and much of that evidence relates directly to Mahaffey. Mahaffey's statement during the first breach of lease case that "the limited partners make no decisions" strongly suggests that Mahaffey was well aware that as a general rule, limited partners did not actively participate in the management of a limited partnership.

After that case was over, Mahaffey sent an e-mail to JR's counsel that included a number of thinly veiled threats of ongoing litigation, pointing to "many other battles ahead between these clients." He warned of a new action, and stated that if JR did not wish to discuss settlement seriously, "[t]here will be many opportunities in the next five years of Superior Court and Court of Appeal litigation to further develop the clients view points. . . . At this point I assume they understand that 500K a year of an attorneys fees budget on this lease will become the norm for many years to come . . . ." Several months later, after the interpleader action was filed, Mahaffey again stated that if JR did not settle, they could look forward to "the next five to ten years are going to be between our clients in multiple Courts" which would be a "fee generator" for the lawyers in the case. Taken together, all of these statements raise a strong inference that Mahaffey's (and the Lawrences') goal in the ongoing litigation was not to resolve genuine legal disputes, but to push JR into a settlement.

Rochelle was brought into the interpleader action when the Lawrences filed the second cross-complaint, and the other limited partners were added by Roe amendment shortly thereafter. A number of things happened thereafter that suggest the limited partners were sued for an improper purpose. When Scheithauer asked Ghormley why the limited partners had been sued for breach of a lease to which they were not parties, she responded that "Doug Mahaffey has plans for the Limited Partners."

After the limited partners (except Rochelle) filed a demurrer and 170.6 motion, Mahaffey contacted Scheithauer and claimed that the Lawrences and the limited partners should be "aligned" against JR and Spiezia. He offered to dismiss the limited

25

partners (except Rochelle) if they would withdraw the 170.6 motion, and then offered to "represent the Limited Partners in a 'derivative' action against JR Enterprises and John Spiezia on contingency and . . . provide a 'finders fee'" to Scheithauer's firm. He was unconcerned about a conflict of interest because the limited partners "were 'not really at fault'" and had been sued "'to get their attention' and be sure they were aware of how JR Enterprises had ignored the Lawrences' attempts to settle . . . ." After the limited partners were dismissed, Mahaffey called Scheithauer and told him that if the 170.6 motion was not withdrawn and was granted, the Lawrences would "re-sue" the limited partners they had just dismissed. He repeated similar threats in court.

All of these acts raise a very strong inference that the limited partners had not been sued to vindicate a legal right, but to act as pawns in the Lawrences ongoing chess game against JR. Indeed, a reasonable trier of fact could conclude that this case appears to be a poster child for cases instituted primarily for an improper purpose, which is one of the hallmarks of malice. (*Sierra Club Foundation v. Graham*, *supra*, 72 Cal.App.4th at p. 1157.)

The only evidence to contradict the facts the limited partners established was Mahaffey's reply declaration, which, as we have noted several times, was properly deemed inadmissible. But even if we did consider Mahffey's self-serving declaration, at best it would serve to create factual disputes that are not sufficient grounds upon which to grant the anti-SLAPP motion. (*Soukup*, *supra*, 39 Cal.4th at p. 269, fn. 3.) Was the evidence sufficient? "Overwhelming" would be a better word. The limited partners more than met their burden to establish a prima facie case of malice as to Mahaffey.

### 2. *Ghormley*

Ghormley's argument, supported by evidence raised for the first time below in her stricken reply declaration, essentially argued that she was an associate who was

26

following Mahaffey's instructions and nothing more. Even if we considered the stricken reply, there is sufficient evidence of malice to overcome an anti-SLAPP motion.

The limited partners presented evidence that Ghormley signed 25 of the Roe amendments, and her name appeared in the captions of the five deposition notices served on the limited partners. She also communicated with Scheithauer, telling him, when asked why the limited partners were being sued for breach of a lease to which they were not parties, that "Doug Mahaffey has plans for the Limited Partners." In another call, in which she offered to dismiss the limited partners if the first 170.6 motion was withdrawn, she referred to Rochelle as a "special case." When Rochelle was finally dismissed, Ghormley "personally processed" the paperwork.

Attorneys have been held liable for associating into cases containing frivolous claims. (*Cole*, *supra*, 206 Cal.App.4th at p. 1119.) The attorneys in *Cole* claimed "they did no actual work" (*id.* at p. 1115) on the case underlying the malicious prosecution action and had merely associated in on the matter. The court rejected their argument that they could avoid liability for malicious prosecution "merely by showing that they took a passive role in that case as standby counsel." (*Id.* at p. 1100.)

We recognize that an associate attorney is not in the same position as an attorney associating into a case. There is a clear imbalance of power between an often younger associate and an older partner or supervisor, and situations may arise where an associate is put into a difficult position by questioning a more experienced attorney's choices. Nonetheless, however, every attorney admitted to practice in this state has independent duties that are not reduced or eliminated because a superior has directed a certain course of action. (See Bus. & Prof. Code, § 6068.) Thus, the fact that she was following a superior's instructions is not a valid defense to malicious prosecution.

We agree with the trial court that the case against Ghormley was not overwhelming, but her actions were sufficient to raise an inference of malice. She did not merely sign documents, but knew enough about the case to speak to opposing counsel

27

and to propose dismissal in exchange for withdrawing a 170.6 motion — an action that strongly gives rise to an inference that she knew the case had no merit and was being prosecuted for an improper purpose. Thus, the evidence of malice is sufficient to overcome an anti-SLAPP motion.

### 3. *The Lawrences*

Michael's pre-litigation conduct, when taken together with the lack of probable cause, is sufficient to give rise to an inference of malice due to improper purpose. The evidence demonstrated that Michael wanted to sell and redevelop the property, which was impossible due to the long-term lease, and was actively looking for ways to end the lease. Among other things, he tried to reach a side deal with Spiezia, tried to organize the limited partners against JR, and tried to persuade the City of Anaheim to "threaten condemnation" to achieve his goal of terminating the lease. Taken together, these facts raise an inference that Michael did not bring the limited partners into the case because he truly believed they were liable, but as another tactic to create enough misery for JR that they would settle the case. Because of the close relationship between the Lawrences, it is reasonable to infer that Victoria was aware of Michael's actions and shared his intent. We would find the same to be true, incidentally, if Victoria had been the more active spouse in this matter.

The Lawrences offer no evidence sufficient to overcome these facts as a matter of law. Michael's reply declaration, as we have noted, was properly excluded, and at best it would create factual disputes insufficient to overcome the limited partners' prima facie case. (*Soukup*, *supra*, 39 Cal.4th at p. 269, fn. 3.) Victoria offered no evidence at all. We therefore conclude the court did not err in finding the limited partners had established a prima facie case of malice as to the Lawrences.

28

III

DISPOSITION

The trial court's order is affirmed.  The limited partners are entitled to their costs on appeal.


MOORE, J.

WE CONCUR:


RYLAARSDAM, ACTING P. J.


BEDSWORTH, J.


29

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| RUSSELL C. JAY et al., | |
| Plaintiffs and Respondents, | G047325 |
| v. | (Super. Ct. No. 30-2012-00550608) |
| DOUGLAS MAHAFFEY et al., | ORDER GRANTING REQUEST FOR PUBLICATION; NO CHANGE IN JUDGMENT |
| Defendants and Appellants. | |

Respondents have requested that our opinion, filed on July 31, 2013, be certified for publication.  It appears that our opinion meets the standards set forth in California Rules of Court, rule 8.1105(c).  The request is GRANTED.

The opinion is ordered published in the Official Reports.


MOORE, J.

WE CONCUR:


RYLAARSDAM, ACTING P. J.


BEDSWORTH, J.

30